IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| **MICHAEL E. BLACKWOOD,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No.** |
| ) | |
| v. ) | **Judge** |
| ) | **Magistrate Judge** |
| **CUMBERLAND COUNTY, TENNESSEE,** ) | |
| **KENNETH CAREY, JR.,** ) | |
| **CUMBERLAND COUNTY CENTRAL** ) | **Jury Demand** |
| **COMMUNICATIONS COMMITTEE,** ) | |
| **CUMBERLAND COUNTY 911** ) | |
| **EMERGENCY COMMUNICATIONS** ) | |
| **DISTRICT, and CITY OF CROSSVILLE,** ) | |
| **TENNESSEE,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

For his Complaint against Defendants Cumberland County, Tennessee, Kenneth Carey, Jr., in his official and individual capacities, Cumberland County Central Communications Committee, Cumberland County 911 Emergency Communications District, and the City of Crossville, Tennessee (collectively "Defendants"), Plaintiff Michael E. Blackwood states:

### PARTIES

1. Plaintiff Blackwood ("Mr. Blackwood") is a citizen and resident of Crossville, Cumberland County, Tennessee, and a former employee of Defendants.

2. Defendant Cumberland County, Tennessee ("the County"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee.

3. Defendant Carey ("Mr. Carey") is a citizen and resident of Cumberland County, Tennessee, the Mayor of the County, and the Chairman of the Cumberland County Central Communications Committee.

4. Defendant Cumberland County Central Communications Committee ("the CCC") is a purported "board" comprised of officials or directors of both the County and the City of Crossville, Tennessee. Upon information and belief, it is an arm of the County, a County-created body, and an alter ego of the County, Defendant Carey and/or the Cumberland County 911 Emergency Communications District. At all relevant times, Mr. Carey chaired the CCC. The CCC performed functions reserved for a 911 Emergency Communications District.

5. Defendant Cumberland County 911 Emergency Communications District ("the ECD") is a Tennessee municipal corporation and a joint 911 Emergency Communications District between the County and the City that is organized and existing under the laws of the State of Tennessee. The ECD has a "911 Board." Mr. Carey appointed the members of the ECD's 911 Board.

6. Defendant City of Crossville, Tennessee ("the City"), is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee.[1]

## JURISDICTION AND VENUE

7. This is an action for violation of constitutional rights and unlawful employment and other practices and acts brought under 42 U.S.C. § 1983 ("§ 1983"), the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601 *et seq*. ("PEPFA"), the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA"), and the Tennessee Open Meetings Act, Tenn. Code Ann. § 8-44-101, *et seq*. ("TOMA"). The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a). Venue is proper under 28 U.S.C. § 1391.

---

[1] Mr. Blackwood brings this action against the County and Mr. Carey and contends that they are responsible for the conduct complained of herein. He also includes the CCC, the ECD, and the City as defendants because, as set forth herein, it is unclear which entity or entities employed him, which are responsible for the conduct complained of and which had authority to act, and to avoid waiver. Mr. Blackwood's counsel is willing to discuss these issues with Defendants' counsel and attempt to reach agreements or stipulations regarding the proper party defendants.

# FACTS

8. Mr. Blackwood worked for Defendants as the 911 Emergency Communications Dispatch Director ("Communications Director") from December 7, 2015, until he was discharged on August 28, 2017.

9. Mr. Blackwood was qualified for his job as a department head and performed his duties in an excellent manner. Throughout his employment, he was praised for his performance in quarterly CCC meetings, County Emergency Medical Services meetings, and other meetings.

10. Throughout his employment, Mr. Blackwood received no complaints from any of the many emergency responding agencies that he and the Emergency Communications Department supported or from any citizen about him or his performance.

11. While Mr. Blackwood received his paychecks from the County, the funds used to pay his salary were a mixture of County, City, and ECD funds.

12. According to Defendants, Mr. Blackwood was hired and discharged by the CCC.

13. The CCC consisted of the following nine members: the County Mayor, the City Manager, the County Emergency Management Agency Director, the City Police Chief, the City Fire Chief, the County Sheriff, the County Fire Chief, the County Emergency Management Services Director, and the Chairman of the ECD's 911 Board.

14. Upon information and belief, the CCC is an improperly formed or unauthorized "board" exercising powers or functions of the ECD or the ECD's 911 Board and the CCC had no legal authority to discharge Mr. Blackwood pursuant to Tenn. Code Ann. §§ 7-86-101, *et seq*. Upon information and belief, the County and Mr. Carey discharged Mr. Blackwood through the alter ego County entity they created, operated and managed.

3

Case 2:18-cv-00069   Document 1   Filed 08/17/18   Page 3 of 19 PageID #: 3

15. Throughout his employment, Mr. Blackwood engaged in constitutionally and legally protected activity by speaking or engaging in speech activity on matters of public concern, communicating with elected and other public officials, and reporting, opposing, and refusing to remain silent about or participate in illegal activities.

16. Beginning in January 2016 and continuing throughout 2016, Mr. Blackwood spoke and refused to remain silent about the County Finance Department's providing him several incorrect employee rosters and incorrect or inaccurate budget information.

17. Mr. Blackwood needed accurate employee rosters and budget information to prepare budgets and ensure that employees were paid properly. The rosters that the Finance Department provided him contained names of several employees who did not work in his department and omitted names of several employees who did.

18. Mr. Blackwood spoke to the following individuals about the incorrect employee rosters and budget information: County Finance Director Nathan Brock and his Assistant Jennifer Turner, the elected County Mayor (Mr. Carey), elected County Sheriff Casey Cox, Chief Deputy Sheriff Bill Ashley, City Police Chief Rodney Shoap, Sergeant J.C. Hancock, EMA Director Keith Garrison, elected County Commissioners David Gibson and Tim Clafin, the County Attorney, and Attorney Mark Strange.

19. Additionally, from February 2016 through July 2017, Mr. Blackwood spoke and refused to remain silent about Mr. Carey's instructing him to falsify his work hours, change his quarterly compensation time reports and "write zero" in spaces provided in them, and about Defendants' not paying him compensation time and holiday time as reflected on his timesheets.

20. Mr. Blackwood was required to complete and submit quarterly reports to the County Finance Department. He accurately recorded his work hours and dates in these reports.

21. Mr. Blackwood reasonably believed that he was entitled to compensatory time for the hours that he worked in excess of 40 per week and holidays that he worked as reflected on his timesheets, and that Defendants were violating federal and state overtime laws in directing him to falsify his work hours and change quarterly reports, and in not paying him compensation time. Other salaried department heads received compensation time, including but not limited to EMA Director Rick Williams and his predecessor, Mr. Garrison.

22. Mr. Blackwood spoke to Mr. Brock and Ms. Turner, Mr. Carey, Sheriff Cox, Chief Deputy Ashley, Sergeant Hancock, EMA Director Garrison, and Attorney Strange about Mr. Carey's directing him to falsify his work hours and change quarterly reports and Defendants' not paying him compensation time.

23. Moreover, beginning in late May 2016 and continuing throughout his employment, Mr. Blackwood spoke and refused to remain silent about the misuse of public funds and inaccuracies and omissions in the 911 Board budget, the County budget and related accounting and financial records. For example, he spoke and refused to remain silent about the fact that there were hundreds of thousands of dollars missing or unaccounted for in the 911 Board budget; the 911 Board's only funding two County dispatchers to attend workshops while funding complete trips for 911 Board members whom Mr. Carey appointed, ECD employees, and each of their families, including travel and hotel expenses, meals, alcoholic beverages, per diem, mileage, and the like using public funds; the 911 Board's not placing competitive bids and paying excessive amounts for projects such as resealing the parking lot, cleaning the fence, and repairing a curb around the Communications Building; the 911 Board's not placing bids and purchasing vehicles allegedly for "911"; the 911 Board's paying its employees, including two secretaries, comparatively excessive amounts; the 911 Board's purchasing the "longevity" of

5

three former County employees so that they were no longer County but ECD employees; and the County Finance Director's inaccurate statements regarding approximately $90,000 worth of omissions from the Communications Department's budget managed by the County and funded by the County and the City; and other acts of misuse and waste of public funds.

24. Mr. Blackwood spoke to Sheriff Cox, Chief Deputy Ashley, Police Chief Shoap, EMA Director Garrison, Sergeant Hancock, Major Mark Rosser, County Commissioner Clafin, Mr. Brock, Mr. Carey, and Attorney Strange about the 911 Board and County budget and accounting records issues and concerns. He provided copies of these budgets and records to some of these individuals, who agreed that they appeared to be incorrect or improper.

25. When Mr. Carey learned of Mr. Blackwood's protected speech and reporting activity concerning the budgets, he asked him, "Why are you making so much noise about the budgets?" Mr. Blackwood expressed his concerns and stated that the budget issues needed to be addressed and corrected. He further stated that he was a citizen and a taxpayer and wanted to know where the public funds were going and how they were being spent.

26. On several occasions in 2016 and 2017, Mr. Carey stated to Mr. Blackwood in reference to his voicing and reporting concerns about the budgets, "You need to worry about your department and not anyone else's" and "mind your own business." He often added as veiled threat and effort to chill Mr. Blackwood's protected speech, "I have a lot of complaints about you." Mr. Blackwood repeatedly asked him who had complained about what. Mr. Carey would only respond, "I would worry about yourself if I were you" and the like.

27. On another occasion, Mr. Blackwood asked Mr. Carey why a budget meeting was being held on Saturday. Mr. Carey responded, "That's how we get around the Sunshine Law."

6
Case 2:18-cv-00069   Document 1   Filed 08/17/18   Page 6 of 19 PageID #: 6

28. Additionally, on or about June 30, 2016, Police Chief Shoap was forced to resign his position with the City.

29. In July and September 2016, Chief Shoap submitted properly completed requests for public records to Mr. Blackwood under the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-101, *et seq.* ("TPRA"), and/or the Freedom of Information Act, 5 U.S.C. § 522, *et seq.* ("FOIA").

30. Mr. Blackwood complied with Chief Shoap's requests and provided him the records he requested, as required by law.

31. After he provided the records, Mr. Carey confronted Mr. Blackwood on multiple occasions, got angry at him, asked if he was "helping Chief Shoap" with his requests, and instructed him not to provide any more public records to Chief Shoap.

32. Mr. Blackwood opposed Mr. Carey's illegal directive, refused to remain silent about it, and refused to participate in the withholding of properly requested public records. He stated that he was doing his job and that Chief Shoap was entitled to the records as requested. He further spoke about and reported the illegal directive to Chief Shoap, Sheriff Cox, Deputy Chief Ashley, EMA Director Garrison, and Sergeant Hancock.

33. By the spring of 2017 Mr. Carey was making concerted efforts to find or generate reasons to terminate Mr. Blackwood's employment in retaliation for his ongoing protected speech and reporting activity.

34. On April 27, 2017, Mr. Carey summoned Mr. Blackwood to a meeting in his office on April 28, 2017, to discuss Mr. Blackwood's disciplining of a 911 dispatcher, Tabitha Randolph.

35. In January 2017, the City Fire Chief, Mike Turner, and Assistant Fire Chief, Chris South, reported to Mr. Blackwood that Ms. Randolph had acted inappropriately toward City firemen. They initially encouraged him to terminate her employment based on her misconduct.

36. Mr. Blackwood conducted an investigation and obtained written statements from Assistant Chief South and City firemen in accordance with the County employee handbook. The investigation revealed that Ms. Randolph had engaged in misconduct. Rather than discharging her, Mr. Blackwood gave her written counseling. The fire chiefs agreed with his actions.

37. In April 2017, Ms. Randolph engaged in further inappropriate conduct toward County EMS Director Chris Miller and Mr. Blackwood. Mr. Blackwood gave her three days off from work based on the severity of her conduct and the fact that she had again engaged in such conduct following the prior written discipline.

38. Mr. Blackwood met with Mr. Carey as requested on April 28, 2017. He provided him copies of the discipline he had administered to Ms. Randolph and the supporting employee statements he had obtained in his investigation.

39. Mr. Carey stated, "This happens with a new Director about every year and a half and we have to start looking for someone else." Mr. Blackwood responded that he had properly administered the discipline and asked Mr. Carey to review the documentation he had provided.

40. Mr. Carey did not review the documentation but stated, "I heard you were having inappropriate relationships with dispatchers" and, "People are saying you are a homosexual."

41. Mr. Blackwood was taken aback by Mr. Carey's discriminatory comments and denied having any inappropriate relationships with any employee.

42. Mr. Carey then stated, "We had a gay guy in your position one time before and we ran him off; he's dead now." Mr. Blackwood indicated to Mr. Carey that his comments were offensive and inappropriate.

43. Mr. Carey then handed Mr. Blackwood an employee timecard that had an error on it and asked him if he had signed the employee's timecard. Mr. Blackwood stated that he had. He also stated that it was employees' responsibility to accurately complete their timecards, that he merely approved them, and that the Finance Department reviewed and processed them. He further stated that the error could and would be corrected, and it was corrected.

44. As Mr. Blackwood was leaving the April 28, 2017, meeting, Mr. Carey stated to him, "I've never seen a gay marine before." Mr. Blackwood had previously served in the United States Marine Corps.

45. Mr. Carey made false statements about Mr. Blackwood's sexual orientation to other employees and third parties who indicated to Mr. Blackwood that he had done so.

46. Mr. Blackwood opposed Mr. Carey's discriminatory comments and reported them to Sheriff Cox, Chief Deputy Ashley, Sergeant Hancock, and County Commissioner Gibson.

47. Mr. Blackwood also repeatedly requested timecard and other training for his employees from Defendants and the County Finance Department. No such training had been or was provided.

48. On May 1, 2017, Mr. Carey directed Mr. Blackwood to schedule a meeting of the CCC to address a grievance submitted by Ms. Randolph regarding the discipline he had administered to her in mid-April 2017. The meeting was scheduled for May 9, 2017.

49. The CCC met on May 9, 2017. Mr. Carey led the meeting. He stated that the CCC had convened to hear Ms. Randolph's grievance against Mr. Blackwood and that "the

[CCC] Board has the ability to fire [Mr. Blackwood] whenever they choose." Attorney Strange attended the hearing with Mr. Blackwood.

50. Mr. Carey did not follow County custom, policy, and practice with respect to his handling of the Randolph grievance. He provided the CCC members a copy of the alleged grievance, which was an April 17, 2017, letter to him from Ms. Randolph, in advance of the May 9 hearing. He did not, however, provide the CCC the documentation and employee statements that Mr. Blackwood had provided him regarding the matter on April 28, 2017.

51. Additionally, Mr. Carey only provided Mr. Blackwood a copy of Ms. Randolph's April 17 letter to him less than one hour before the May 9 hearing. When Mr. Carey handed him the letter, he smiled and stated, "How's your boyfriend doing?"

52. At the May 9, 2017, hearing, Mr. Blackwood provided the CCC members copies of the documentation and employee statements that he had previously provided to Mr. Carey.

53. At the May 9 hearing, Mr. Carey introduced Ms. Randolph to the CCC members and had her sit beside him throughout the hearing.

54. At the May 9 hearing, Ms. Randolph made false accusations against Mr. Blackwood, as demonstrated by the documentation and employee statements he had provided.

55. City Fire Chief Turner and County Sheriff Cox asked Ms. Randolph if she had any witnesses or documentation to support her allegations against Mr. Blackwood. She stated that she did not.

56. The CCC voted to allow the disciplinary action that Mr. Blackwood had administered to Ms. Randolph to stand. After it did so, Mr. Carey placed his arm around Ms. Randolph to console her.

57. On May 12, 2017, the self-professed "best friend" of Mr. Carey whom Mr. Carey had appointed to the 911 Board, County Solid Waste Director Michael Harvel, stated to Mr. Blackwood, "The Mayor don't like being shown up by no queer."

58. On May 31, 2017, EMA Director Garrison advised Mr. Blackwood that Mr. Carey had stated to him that Mr. Blackwood had allegedly intimidated employees into providing written statements. Mr. Blackwood denied intimidating any employee. Mr. Garrison, who had worked with Mr. Blackwood, stated that he agreed with him but wanted to let him know what Mr. Carey had stated. He further advised Mr. Blackwood that Mr. Carey was "fishing for something on [him] and [was] out to get [him]."

59. Sometime shortly before August 28, 2017, Mr. Carey convened a secret meeting of an alleged "executive committee" of the CCC. There is no legally authorized executive committee of the CCC. Nor is there any executive committee in the CCC's charter document.

60. The "executive committee" meeting was not a public meeting. No public notice was given nor was an agenda circulated for it. Upon information and belief, Mr. Carey provided the meeting attendees false information, orally and in writing, about Mr. Blackwood and directed that he be discharged.

61. Next, on August 28, 2017, at 1:00 p.m., the CCC convened an alleged "emergency" or "special session" meeting at the Crossville City Hall, which was not the usual location for CCC meetings. Typically, the CCC met at the Communications Building.

62. Members of the press or news media and other individuals were present at the August 28, 2017, special meeting.

63. The CCC publicly announced the decision to discharge Mr. Blackwood at the August 28, 2017, meeting.

64. Mr. Blackwood was never formally invited, let alone directed, to participate in the August 28, 2017, special meeting. He learned that a meeting was taking place but, as Defendants knew, he had a pre-scheduled doctor's appointment at Vanderbilt University Medical Center in Nashville at 1:15 p.m. that day related to his post-cancer surgery treatment.

65. While he was in the waiting room at Vanderbilt on August 28, 2017, Mr. Blackwood received a text message from ECD Director Eric Ritzman at 1:16 p.m. informing him that he had been discharged in the CCC meeting and stating, "Apparently it was already a done deal." Mr. Ritzman also expressed his disbelief, disappointment, and anger to Mr. Blackwood over Mr. Carey's having orchestrated and directed his discharge. This was how and when Mr. Blackwood learned that Defendants had discharged him.

66. Upon information and belief, Mr. Carey recommended, encouraged and influenced the executive committee and/or the CCC to terminate Mr. Blackwood's employment by providing false information as to three alleged reasons for the discharge: 1) he was allegedly performing "illegal" NCIC checks; 2) he was allegedly "falsifying" employee timecards; and 3) he had allegedly had an "inappropriate relationship" with another employee.

67. These reasons are false and pretexts for illegal retaliation. Upon information and belief, no documentation was provided at the August 28, 2017, meeting substantiating the allegations against Mr. Blackwood. Further, an audit was completed that demonstrated that there was no misuse of the NCIC system. The timecards that 911 dispatchers submitted are consistent with training rosters showing that they attended and completed training sessions in 2017. None of them were required to repay any funds allegedly improperly received. Nor were any of them dismissed or replaced for having invalid certifications as a result of not attending training

sessions. Mr. Blackwood's department was under or within its budget at all relevant times. Finally, Mr. Blackwood had no inappropriate relationship with any employee.

68. During the August 28, 2017, meeting, 911 Board Chairman Everett Bolin asked Mr. Carey for the reasons for Mr. Blackwood's discharge, stating that he had been unable to attend the prior "executive committee" meeting during which Mr. Carey provided the reasons. Mr. Bolin also stated that he "didn't get the email" in which the reasons had also been stated.

69. Mr. Carey orchestrated and directed the private executive committee meeting as a means of evading the requirements of the TOMA and to discharge Mr. Blackwood. Mr. Blackwood's discharge violated the TOMA and was null and void.

70. During the August 28, 2017, meeting, County Fire Chief Trevor Kerley acknowledged that Mr. Blackwood was "not here to defend himself" and that "we've never had a sit down with [Mr. Blackwood] and him say yes or no to the [accusations]" against him.

71. On August 29, 2017, the *Crossville Chronicle* newspaper, which was at the August 28 meeting, published a public news article titled, "Blackwood terminated as E-911 dispatch director." The article stated that Mr. Carey had reiterated his previously stated reasons for discharging Mr. Blackwood in the August 28 meeting: "[T]here were issues with records in E-911 dispatch including falsifying time sheets, conduct with subordinates, and a potential misuse of the NCIC computer system."

72. Further, based on the false information Mr. Carey had provided, the CCC also banned Mr. Blackwood from public property and the Communications Building. This, too, was reported in the August 29, 2017, public newspaper article.

73. In addition to the *Crossville Chronicle*, other news media outlets and social media sources reported Defendants' false allegations against Mr. Blackwood to the public.

74. Mr. Blackwood did not receive any disciplinary action regarding his job performance or any alleged misconduct, including the matters for which he was allegedly discharged, before he was discharged, as contemplated by the County personnel manual or employee handbook, the City personnel ordinance, and applicable custom, policy and practice.

75. Defendants never provided Mr. Blackwood written notice of the charges against him before he was discharged.

76. Defendants did not follow their custom, policy, and practice of providing an accused department head or employee written notice of the charges or allegations against him; a meaningful opportunity to respond to or rebut those charges; and a grievance, due process or other hearing before discharging Mr. Blackwood.

77. Defendants treated Mr. Blackwood differently and less favorably in the terms, conditions and privileges of employment than they treated other employees who engaged in the same, similar and worse conduct than that in which he is alleged to have engaged. These include, but are not limited to, County Solid Waste Director and ECD 911 Board member Michael Harvel, who has been indicted by a grand jury and charged with counts of sexual battery, assault, and official misconduct but not discharged; employees who allegedly submitted "falsified" timecards but were not discharged; employees who failed urinalysis or drug tests but were not discharged; and other employees who received written notice of charges against them or progressive discipline and/or who were not discharged.

78. Following his retaliatory discharge Defendants did not pay Mr. Blackwood for his last day of work or the compensation time they owe him. They further gave the Tennessee Consolidated Retirement System inaccurate and incorrect information about his length of service, adversely affecting his retirement benefits.

79. Mr. Blackwood has been stigmatized and harmed by Defendants' public dissemination of false information about him and the alleged reasons for his discharge. He lost his government security clearance and other employment opportunities as a result of Defendants' publicizing their false allegations against him.

80. Mr. Blackwood spoke and refused to remain silent about or participate in violations of federal and state law and engaged in protected activity by speaking to elected public officials and others about matters of public concern and conduct that he reasonably believed to be illegal and in violation of applicable codes, laws and regulations.

81. Speaking to elected public officials and others about some of the matters of public concern and illegal conduct at issue was not a part of Mr. Blackwood's regular or official job duties, while speaking about other matters and conduct were related to his job duties. Substantial portions of his speech activity, including but not limited to those about the 911 Board and County budgets and accounting and financial records, violations of the TPRA and the FOIA, and Mr. Carey's discriminatory statements, were not given pursuant to a duty as a 911 Communications Director but rather as a cooperative person and concerned citizen exposing what he believed to be misuse of public funds and wrongdoing.

82. As County Mayor and Chairman of the CCC, Mr. Carey supervised and exercised control over Mr. Blackwood and the terms and conditions of his employment.

83. Mr. Carey had final policy making authority on behalf of the County and abused his authority under color of state law in orchestrating, recommending, influencing and directing Mr. Blackwood's discharge.

84. Mr. Carey's conduct violated clearly established statutory and constitutional rights of which he and objectively reasonable persons in his position would have known, and such conduct was unreasonable in light of those clearly established rights.

85. Mr. Blackwood's speaking or engaging in speech conduct on matters of public concern, communicating with elected public officials and others, and refusing to remain silent about or participate in illegal activities motivated and caused his discharge.

86. Defendants retaliated against Mr. Blackwood in violation of § 1983 and the First Amendment to the United States Constitution, the PEPFA, and the TPPA.

87. Defendants' conduct as described in this complaint was willful, malicious and/or recklessly indifferent to Mr. Blackwood's protected rights and was intentional, malicious, reckless and/or fraudulent.

88. As a result of Defendants' conduct, Mr. Blackwood has lost income and other privileges and benefits of employment, suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, damage to his reputation and standing in the community, and loss of enjoyment of life; and incurred attorneys' fees, costs and expenses.

## CLAIMS

89. Mr. Blackwood incorporates all of the paragraphs above as if fully stated in each count below.

### Count I Against All Defendants
### Violation of 42 U.S.C. § 1983 / First Amendment Retaliation

90. Defendants deprived Mr. Blackwood of his rights secured by the Constitution while acting under color of state law.

91. Mr. Blackwood engaged in constitutionally protected speech activity as a citizen on matters of public concern and his interest in such activity outweighs Defendants' interest in promoting the efficiency of the public services they provide as employers.

92. Mr. Blackwood suffered adverse employment actions as described above that would chill an ordinary person in the exercise of his constitutional rights.

93. Mr. Blackwood's speech activity was a substantial or motivating factor in the adverse actions he suffered.

94. Defendants subjected Mr. Blackwood to adverse employment actions in violation of 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.

95. Defendants acted with malice or reckless indifference to Mr. Blackwood's federally protected rights.

96. Defendants' conduct harmed and caused damage to Mr. Blackwood.

### Count II Against the County, the CCC, the ECD, and the City
### Violation of the PEPFA

97. Mr. Blackwood's exercise of his right to communicate with elected public officials, including but not limited to Sheriff Cox, County Commissioners Gibson and Clafin, and Mr. Carey was a substantial or motivating factor in the discriminatory and retaliatory conduct that he suffered.

98. Defendants discriminated and retaliated against and discharged Mr. Blackwood in violation of the PEPFA.

99. Defendants' conduct was intentional, reckless, malicious, and/or fraudulent.

100. Defendants' conduct harmed and caused damage to Mr. Blackwood.

### Count III Against the County, the CCC, the ECD, and the City
### Violation of the TPPA

101. Defendants terminated Mr. Blackwood's employment because he exercised his constitutional and statutory rights and refused to remain silent about or participate in conduct that violated, or that he reasonably believed violated, codes, laws and regulations intended to protect the public health, safety or welfare.

102. Defendants terminated Mr. Blackwood's employment in violation of the TPPA.

103. Defendants' conduct was intentional, reckless, malicious, and/or fraudulent.

104. Defendants' conduct harmed and caused damage to Mr. Blackwood.

### Count IV Against the County, the CCC, the ECD, and the City
### Violation of the TOMA

105. Defendants' discussing, deliberating, and/or deciding to discharge Mr. Blackwood in one or more private, non-public meetings, including but not limited to the August 2018 meeting of the "executive committee" of the CCC, violated the TOMA.

106. The CCC did not have legal authority to discharge Mr. Blackwood, let alone the "executive committee" of the CCC.

107. Defendants' decision to discharge Mr. Blackwood is null and void.

108. Defendants' conduct was intentional, reckless, malicious, and/or fraudulent.

109. Defendants' conduct harmed and caused damage to Mr. Blackwood.

### RELIEF REQUESTED

WHEREFORE, Mr. Blackwood respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits;

3. Reinstatement or, alternatively, front pay and damages for lost benefits;

4. Compensatory damages for embarrassment, humiliation, emotional distress and anxiety, inconvenience, damage to reputation, and loss of enjoyment of life;

5. Treble damages under the PEPFA;

6. Punitive damages under § 1983 and the TPPA;

7. Attorneys' fees, costs and litigation expenses;

8. Prejudgment interest and, if applicable, post-judgment interest;

9. With respect to his TOMA claim, equitable and/or injunctive and legal relief, including reinstatement with back pay, retirement, insurance, seniority, and other benefits; actual and consequential damages sustained; all exemplary or other damages available; and attorneys' fees and costs; and

10. Such other and further legal or equitable relief to which he may be entitled.

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (BPR No. 19112)
Law Office of Douglas B. Janney III
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 742-5900
doug@janneylaw.com

*Counsel for Plaintiff, Michael E. Blackwood*